UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ALICIA HOPPER,

      Plaintiff,

  - against -

BANANA REPUBLIC, LLC,
BANANA REPUBLIC, INC., and
THE GAP, INC.,

      Defendants.
-----------------------------------------------------------------x

07-CIV-8526 (WHP)(THK)

**DECLARATION OF
JEREMI L. CHYLINSKI**

JEREMI CHYLINSKI hereby declares:

1. I am a member of the Bar of the State of New York and an associate in the firm of Seyfarth Shaw LLP, attorneys for Defendants Banana Republic, LLC, Banana Republic, Inc., and The Gap, Inc. (collectively, "The Gap") in the above-captioned case. I submit this Declaration in support of Defendants' Motion to Dismiss Plaintiff's Complaint, Or In The Alternative For Summary Judgment.

2. Attached hereto as Exhibit A is a true and correct copy of the agreement between RGIS, LLC and The Gap, entitled the RGIS Inventory Specialists Inventory Services Agreement, dated April 20, 2007.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

November 30, 2007

                   JEREMI L. CHYLINSKI

NY1 26492617.1

A



# INVENTORY SERVICES AGREEMENT

THIS AGREEMENT is made and entered into on this 1st day of February 2007, hereinafter referred to as the Effective Date, by and between **RGIS, LLC**, a Delaware limited liability company, hereinafter referred to as RGIS, with its principal place of business at 2000 East Taylor Road, Auburn Hills, Michigan, USA 48326, and **Gap, Inc**, hereinafter referred to as Customer, a Delaware corporation, including its subsidiaries, divisions and affiliated companies with its principal place of business at Two Folsom Street, San Francisco, California 94105 ("Customer" or "Gap").

WHEREAS, Customer desires certain inventory services; and

WHEREAS, RGIS is in the business of supplying inventory services; and

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, Customer and RGIS agree as follows:

1. SERVICES. During the term of this Agreement, RGIS shall supply inventory services to various locations as may be from time to time agreed upon by the parties ("Services").

2. TERM/TERMINATION. This Agreement shall be in force for two (2) year(s) from the date of execution unless earlier terminated as set forth herein. Customer may terminate this Agreement at any time without cause with thirty (30) days written notice. Either party may terminate this Agreement in the event of a material breach of the other party's obligations hereunder and such other party's failure to cure such breach within thirty (30) days after receiving written specific notice of the breach being asserted. To the extent permitted under applicable law, Customer or the RGIS have the right to cancel any work order under this Agreement, to terminate this Agreement without obligation, or to require assurances of satisfactory performance if either party becomes insolvent or files a voluntary petition under any bankruptcy or insolvency law or makes an assignment for the benefit of creditors or if a petition under any bankruptcy or insolvency law is filed against RGIS.

3. PAYMENT. RGIS shall perform the services and be paid according to the terms of the Statement of Work which shall be attached to this Agreement as Exhibit A. Customer will pay RGIS within thirty (30) days following Customer's receipt of an undisputed invoice. RGIS shall invoice Customer weekly for Services rendered during the preceding week's period. The invoice will detail the work performed during such period. Customer shall have no obligation to make payment on any RGIS invoice received by Customer more than sixty (60) days after the date on which RGIS renders Services. In the event of a dispute with regard to a portion of an invoice, Customer may withhold the portion of the payment relating to the disputed portion of the invoice. If Services rendered do not reasonably meet Customer's satisfaction and approval, Customer may at its discretion withhold payment (or a reasonable portion thereof) and request a timely re-performance of said Services.

4. RELATIONSHIP OF PARTIES. The parties intend that an independent contractor relationship shall be created. The control of the work will be within the sole control of RGIS. All expenses incidental to the performance of the services, including, but not limited to, employee wages and training, shall be borne by RGIS. However, the services contemplated herein must meet the approval of Customer and shall be subject to Customer's general right of inspection and supervision to secure the satisfactory completion thereof. Neither RGIS, nor its employees are entitled to any of the benefits that Customer provides its employees. It is understood that Customer will not provide and shall not be responsible for workers' compensation insurance for RGIS or any of its employees.

RGIS agrees to assume full responsibility for all compensation owed or remuneration due any of its own employees as a result of work or services performed pursuant to this Agreement. RGIS further agrees to

Version - 12/3/06

fully and completely indemnify Customer for any claims paid, liens assessed or moneys found owing by Customer to any of RGIS' employees for work performed under this Agreement. Indemnification shall include reasonable attorney fees and the costs of defending any lawsuit, lien or other legal action brought to recover sums owed by RGIS to its employees for performance of this Agreement.

5. All Services and Deliverables will be provided by an employee of RGIS or, upon the prior written consent of Customer, of RGIS' subcontractor ("Subcontractor"). RGIS shall pay, or shall ensure that its Subcontractor is paying, all necessary employment taxes required by law. RGIS also shall report employees' income and withhold all required taxes from such income, as may be required by law, or ensure that its Subcontractor is reporting and withholding all required taxes. Neither the employees of RGIS nor its Subcontractor employees shall be entitled to receive any vacation or illness payments, or to participate in any plans, arrangements, or distributions by Customer pertaining to any bonus, stock option, profit sharing, insurance or similar benefits for Customer employees. In addition, RGIS agrees that it will provide for, or ensure that its Subcontractor will provide for, Workers' Compensation, unemployment, disability and all other coverage required under applicable local, state or federal law. RGIS further agrees that it will defend (including payment of all attorneys' fees) and indemnify Customer against any claim asserted against Customer for RGIS' failure, or its Subcontractor's failure, to comply with its obligations under this provision. RGIS hereby waives any and all rights to any of the above Customer employment benefits even if RGIS is later reclassified to be a common law employee.

6. LIABILITY AND RESPONSIBILITY FOR EQUIPMENT. Customer shall not be responsible, nor be held liable for any injury or damage to any person or property resulting from the use, misuse or failure of any equipment used by RGIS or any of its employees, subcontractors or agents even if such equipment is furnished, rented or loaned to RGIS by Customer, except to the extent caused by Customer's negligence. The acceptance of use of any such equipment by RGIS or any of its employees shall be construed to mean that RGIS accepts full responsibility for, and agrees to indemnify Customer against, any and all loss, liability and claims for injury or damage whatsoever resulting from the use, misuse or failure of such equipment, except to the extent caused by Customer's negligence.

7. RGIS' RESPONSIBILITIES; RGIS understands and agrees that RGIS shall be responsible for providing the services the entire term of this Agreement. If for any reason RGIS cannot provide the services, RGIS shall provide ten (10) days' notice to Customer. RGIS agrees to instruct its employees on all safety requirements of Customer, and RGIS shall comply with all OSHA or other applicable laws and regulations in performing the services for Customer.

RGIS will provide trained and qualified employees to work Customer's facility(ies). RGIS shall comply with all state and federal laws and Immigration and Naturalization Regulations in its employment of personnel. Customer shall have the sole and exclusive right to refuse the proposed RGIS employee to work in Customer's facility(ies) for any reason.

RGIS warrants that the Services will be performed in a professional manner consistent with the level of care, skill, practice and judgment exercised by other professionals in performing Services of a similar nature under similar circumstances by personnel with requisite skills, qualifications and licenses needed to carry out such work. In addition, the Services shall conform to all proposals, descriptions and specifications, if any, supplied by Customer, or supplied by RGIS and approved by Customer. RGIS shall re-perform any work not in compliance with this warranty, provided RGIS is advised in writing of such nonconformance within thirty (30) days after the Services are provided. RGIS shall provide, at its expense, such "tools of the trade" as are reasonably required to render the Services for Customer hereunder. If goods may be provided hereunder, RGIS further warrants that all such goods are merchantable and fit for the use and purpose for which they are intended and that they are free from any defects or matter injurious to persons or property.

Where special licenses are required for certain categories of jobs, RGIS shall confirm with the appropriate licensing authorities that the Person has such specialized license and that such license is current. In rendering Services under this Agreement, RGIS shall not assign any person to perform Services under the terms of this Agreement if the person, to the best of RGIS' knowledge, is known to have been convicted on a charge of either (a) fraud, deceit or theft, including but not limited to embezzlement; or (b) assault or battery, or any more serious charge of physical harm. RGIS's failure to comply with its obligations under this provision of the Agreement shall constitute a material breach, which allows Customer to terminate the

6/13/06                                                                 2

Agreement immediately. At all times while on Customer premises, RGIS and its Subcontractor(s), if applicable, shall comply with Gap's Zero Means Zero Anti-harassment Policy, a copy of which is attached hereto as Exhibit B.

8. REMEDIES. In the event that RGIS breaches any representations or warranties hereunder or fails to comply with any term or requirement of this Agreement, including but not limited to timely delivery of services and/or products, Customer shall have the right, at its sole option to (a) terminate or cancel this Agreement in its entirety or as it relates to any specific services and/or products if the problem is not resolved with in 30 days; provided, however, RGIS shall be entitled to full payment for Services rendered up to and including the date of termination subject to any offsets as described hereunder, (b) reject such services and/or products, in whole or in part; (c) withhold any payments or refunds due to Customer; (c) recover any and all actual damages, including costs of cover, reasonable attorney's fees and costs; and/or (d) request that RGIS either re-perform the services, at no additional charge to Customer or alternatively, refund to Customer the fees paid for such nonconforming services and/or products; and/or (f) offset any amounts due to RGIS by any actual or estimated loss incurred by Customer. Customer's remedies hereunder are in addition to any other remedies of Customer available hereunder or under any statute or law or otherwise. Customer will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief without prejudice to any other rights and remedies that Customer may have for a breach of this Agreement.

9. REASSIGNMENT AND REMOVAL OF SERVICE PERSONNEL. Customer reserves the right to remove any of RGIS' employees providing services pursuant to this Agreement from Customer's premises at any time when any of RGIS' employees are acting contrary to the best interests of Customer's business or are in violation of Customer's policies and procedures.

10. INDEMNITY. RGIS hereby agrees to defend, indemnify and hold harmless Customer, its corporate affiliates and their respective directors, officers, employees and agents, from and against any and all losses, damages, injuries, claims, suits, demands, judgments, decrees, losses, costs, expenses and liabilities, including, but not limited to, reasonable attorney fees and courts costs for property damage and personal injury, including death, which may be suffered, incurred or asserted by any person, including RGIS' employees and agents, in connection with or arising out of the providing the Services, except to the extent caused by Customer's negligence.

11. HEALTH & SAFETY INDEMNITY (OSHA). Customer shall indemnify and defend RGIS from all losses and/or fines arising out of violations of federal, state or local safety and health related laws where Customer has failed to properly and fully advise RGIS of any applicable safety and health-related requirements and procedures.

12. INSURANCE. RGIS, at its sole cost and expense, shall maintain in effect at all times during the rendering of services all the insurance specified below with insurers having a Bests rating of at least A-, Class X, and under forms of policy satisfactory to Customer:

    A. Commercial General Liability Insurance with at least $2,000,000 Combined Single Limit Bodily Injury and Property Damage and $2,000,000 Personal Injury and Advertising Injury written on an Occurrence form. A general aggregate of $4,000,000 will apply.

    B. Owned, Non-Owned and Hired Automobile Liability Insurance with at least $2,000,000 Combined Single Limit Bodily Injury and Property Damage.

    C. Full statutory coverage for Workers' Compensation and Disability Insurance for all its employees as required by law, and Employers Liability with limits of at least $500,000. These policies will contain waivers of the insurer's subrogation rights against Customer where permitted by law.

    D. Fidelity Coverage, naming Customer as obligee or loss payee, insuring loss(es) due to the dishonest acts, including but not limited to Computer Fraud, of Licensor's employees with limits of at least $500,000.

6/13/06                                                3

Gap, its officers, directors, employees, representatives, its subsidiary and affiliated companies shall be named as an "Additional Insured" under Commercial General Liability Insurance. All policies maintained by RGIS shall be written as primary policies, not contributing with and not supplemental to coverage Customer may carry. Certificates of insurance evidencing all these coverages and providing Customer with thirty (30) days written notice of cancellation, intent to non-renew, or adverse material change shall be included in this Agreement as a reference document as Attachment [ A] ("Certificate of Insurance"). RGIS shall ensure and further warrants that said policies are maintained and current during the term of this Agreement and, if a policy may be near to expiration, then RGIS shall notify GAP in writing at least ten (10) days prior to the expiration of the term of each said policy. None of the requirements contained herein as to types, limits and approval of insurance coverage to be maintained by RGIS are intended to and shall not in any manner limit or qualify the liabilities and obligations assumed by RGIS under this Agreement. Receipt of any certificate showing less coverage than requested is not a waiver of RGIS' obligation to fulfill its requirements. RGIS may utilize reasonable deductibles given its size and financial stability. RGIS will be responsible to pay any loss amount, which lies within its deductible, up to the maximum amount of the deductible.

All subcontractors used by RGIS pursuant to this Agreement will be required to comply with the insurance requirements and limits specified above.

13. <u>CONFIDENTIALITY</u>. Each party agrees that (i) all information communicated to it by the other and identified as confidential, whether before or after the Effective Date, (ii) all information identified as confidential to which it has access in connection with the subject matter hereof, whether before or after the Effective Date, and (iii) this Agreement, will be deemed to have been received in confidence and will be used only for purposes of this Agreement. Each party agrees to use the same means as it uses to protect its own confidential information, but in no event less than reasonable means, to prevent the disclosure of such confidential information. No such information will be disclosed by the receiving party without the prior written consent of the other party. However, each party may disclose this Agreement and the other party's confidential information to those of the receiving party's employees who have a need to have access to such information. The receiving party shall remain responsible for such employees' compliance with this confidential information obligation.

<u>Exceptions</u>. The foregoing will not prevent either party from disclosing information that belongs to such party or (i) any information that such party can demonstrate as being within its legitimate possession prior to the time of disclosure by or, on behalf of the other party to such party; (ii) any information which was in the public domain through no fault of such party; and (iii) any information which is disclosed to such party on a non-confidential basis by a third party who has legitimate possession thereof and the unrestricted right to make such disclosure. If confidential information is required to be disclosed pursuant to a requirement of a governmental authority, such confidential information may be disclosed pursuant to such requirement so long as the party required to disclose the confidential information, to the extent possible, provides the other party with timely prior notice of such requirement and coordinates with such other party in an effort to limit the nature and scope of such required disclosure. Upon written request of the disclosing party at the expiration or termination of this Agreement for any reason, or upon request, all such documented confidential information (and all copies thereof) of the disclosing party will be returned to the disclosing party or will be destroyed, with written certification thereof being given to the disclosing party.

14. <u>USE OF GAP NAME</u>. RGIS shall not use Gap's corporate name or any Gap, GapKids, babyGap, GapBody, GapMaternity, Banana Republic, Old Navy, Old NavyMaternity, Forth & Towne, or Piperlime trademark for any purpose, including by way of illustration but not of limitation, advertising, press release, publicizing, marketing or selling the services and/or products provided hereunder, except in connection with the prosecution or defense of claims, lawsuits or governmental or regulatory audits or investigations, or except as may otherwise be required by law. In that event, RGIS shall provide Customer with notice of such request in a timely manner sufficient to allow Customer an opportunity to object prior to such disclosure.

15. <u>OWNERSHIP OF INFORMATION</u>. Customer shall own the results of work performed under this Agreement. Such results shall be considered a "work made for hire" and RGIS irrevocably assigns to Customer, and agrees that Customer shall be the sole and exclusive owner of, all right, title and interest in and to, such results (including, but not limited to; patent, copyright, trade secret and other proprietary rights therein that may be secured in any place under laws now or hereafter in effect) subject to RGIS' ownership interest in

and to any pre-existing works. Following the termination of this Agreement, RGIS shall return all documentation to Customer or destroy the documentation, such determination to be made by Customer in its sole discretion.

16. **CONFLICTING PROVISIONS.** In the event of a conflict between the provisions of any particular Statement of Work and this Agreement, the provisions of this Agreement shall prevail.

17. **NOTICES:** Any notice required or provided for herein shall be deemed to have been given upon placement in the U.S. Mail, postage prepaid, certified mail, return receipt requested, to the address of the other party as provided below:

    To Customer:    GAP, Inc.
                    Two Folsom Street
                    San Francisco, California 94105
                    Attention:

    To RGIS:        RGIS, LLC
                    500 Grapevine Hwy, Suite 360
                    Hurst, TX 76054
                    Attention: Business Development Manager

    With copy to:   RGIS, LLC
                    2000 E. Taylor Road
                    Auburn Hills, Michigan 48326
                    Attention: Office of General Counsel

18. **ASSIGNMENT; BENEFIT, BINDING EFFECT.** This Agreement may not be assigned by either party without the prior written consent of the other party; provided, however, either party may assign this Agreement to its primary lenders without the prior written consent of the other party.

19. **NO THIRD PARTY BENEFICIARIES.** Nothing in this Agreement is intended to or shall be deemed to confer any rights upon any person who is not a party hereto.

20. **NO FIDUCIARY RELATIONSHIP.** Nothing in this Agreement creates any relationship of trust or other fiduciary relationship between the parties hereto.

21. **COUNTERPARTS.** This Agreement may be executed in one or more counterparts, all of which shall be deemed one and the same agreement and shall become effective when each of the parties has signed one or more counterparts.

22. **MERGER AND ENTIRE AGREEMENT.** This Agreement constitutes the full understanding of the parties, a complete allocation of risks between them, and a complete and exclusive statement of the terms and conditions of their agreement, related to the services provided hereunder. All prior agreements, negotiations, dealings and understandings, whether written or oral, regarding the subject matter hereof, are superseded by and merged into this Agreement. This Agreement shall not be modified in any way except by a writing executed by both parties.

23. **MODIFICATION.** No conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary the terms or conditions of this Agreement shall be binding unless hereafter made in writing and signed by the party to be bound, and no modification shall be effected by the acknowledgment or acceptance of any forms containing terms or conditions or variance with or in addition to those set forth in this Agreement

24. **SECTION HEADINGS.** Section headings as to the contents of particular sections are for convenience only and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular sections to which they refer.

25. <u>GOVERNING LAW</u>. The parties expressly agrees that any and all disputes, claims or litigation arising from or related in any way to this Agreement shall be resolved by the federal courts of the State of New York.. The parties hereby waive the right to raise any objection or defense it may have based upon an inconvenient forum. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

25. <u>SEPARATION</u>. In the event any term or provision of this Agreement, or any portion thereof, or any application of any term or provision shall be invalid or unenforceable, the remainder of this Agreement or any other application of such term or provision shall not be affected thereby.

26. <u>FORCE MAJEURE</u>. RGIS shall not be liable for any failure or delay in performing any services which is caused by any circumstance not within the reasonable control of RGIS, including, without limitation, any act of God, war, insurrection, transportation delay, or strike or other labor dispute; provided, however, that RGIS shall notify Customer of any such event.

IN WITNESS WHEREOF the parties have executed this Agreement on the date and year first above written.

RGIS, LLC

/s/ _____
By: Dave Feidner
Title: President, Business Development
Date: 4/20/07

GAP, INC.

/s/ _____
By: Byron Pollitt
Title: CFO
Date: 4/6/07

6/13/06

6

# Exhibit A

## Statement of Work

1. **Project Name:** Physical Inventory

2. **Estimated Timeframe:** Ongoing. From time to time throughout the term of this Agreement, Customer will identify locations for RGIS to perform services (as defined more fully below). For each location, individual timeframes and completion times will be established by RGIS and the appropriate Customer associate/department. It is understood and acknowledged by RGIS that time is of the essence when performing its services, and RGIS has a duty to complete such services within the timeframes established.

3. **Purpose of Services:** In general, services shall include scheduling and performing inventory counts at specified customer locations.

4. **Fees and Payment Terms:** All fees and expenses are expressed in U.S. dollars. For services rendered pursuant to this Agreement for the period beginning the Effective Date of this Agreement, RGIS will invoice Customer for requested services. If the number of inventories ordered by Customer falls below the lowest number listed in the tables below, RGIS reserves to itself the right to increase the rates of charge herein; provided, however, any new rates of charge shall be subject to the written agreement of RGIS and Customer  Customer agrees to pay each invoice within thirty (30) days following the date of receipt of the invoice. During the term of this Agreement, Customer shall pay RGIS for its services according to the following schedules:

    A.  **For complete inventory services performed at Customer store locations:**

    Annual Counts - US Stores

    | Brand | No. of Inventories | Base Rate | No. of Inventories | Base Rate | No. of Inventories | Base Rate |
    |---|---|---|---|---|---|---|
    | Gap | 500 - 657 | $64.95 | 656 - 775 | $63.00 | 776 - 896 | $61.10 |
    | Banana Republic* | 191 - 233 | $64.95 | 234 - 275 | $63.00 | 276 - 318 | $61.10 |
    | Old Navy | 382 - 493 | $63.65 | 494 - 584 | $58.25 | 585 - 673 | $55.10 |
    | Outlet | 113 - 175 | $63.95 | 176 - 207 | $58.25 | 208 - 240 | $55.10 |

    * Includes Forth & Towne

    Annual Counts - Canadian Stores

    | Brand | No. of Inventories | Base Rate | No. of Inventories | Base Rate |
    |---|---|---|---|---|
    | Gap | 90 - 125 | $63.00 | 125 - 158 | $59.97 |
    | Banana Republic | 23 | $63.00 | - | - |
    | Old Navy | 48 | $63.00 | - | - |

### Travel Rates

**US Stores**
An additional travel charge in the amount of $5.50 shall be added to the above rates for each 30 miles of one way travel, beyond the first 30 miles, from the servicing RGIS District Office.

**Canadian Stores**
An additional travel charge in the amount of $5.75 shall be added to the above rates for each 50 Kilometers of one way travel, beyond the first 50 Kilometers, from the servicing RGIS District office.

**Full Counts - US Stores**

| Brand | No. of Inventories | Base Rate | No. of Inventories | Base Rate | No. of Inventories | Base Rate |
|---|---|---|---|---|---|---|
| Gap | 500 - 657 | $54.90 | 656 - 775 | $52.75 | 776 - 896 | $52.00 |
| Banana Republic* | 191 - 233 | $54.90 | 234 - 275 | $52.75 | 276 - 318 | $52.00 |
| Old Navy | 382 - 493 | $54.90 | 494 - 584 | $52.00 | 585 - 673 | $51.60 |
| Outlet | 113 - 175 | $54.90 | 176 - 207 | $52.00 | 208 - 240 | $51.60 |

* Includes Forth & Towne

**Full Counts - Canadian Stores**

| Brand | No. of Inventories | Base Rate | No. of Inventories | Base Rate |
|---|---|---|---|---|
| Gap | 90 - 125 | $56.30 | 125 - 158 | $54.90 |
| Banana Republic | 23 | $56.30 | - | - |
| Old Navy | 48 | $56.30 | - | - |

**Travel Rates**

**US Stores**
An additional travel charge in the amount of $5.50 shall be added to the above rates for each 30 miles of one way travel, beyond the first 30 miles, from the servicing RGIS District Office.

**Canadian Stores**
An additional travel charge in the amount of $5.75 shall be added to the above rates for each 50 Kilometers of one way travel, beyond the first 50 Kilometers, from the servicing RGIS District office.

B. **For services performed at warehouse distribution centers or other special projects:**

Fee based on a rate per man hour:                $30.00 per man hour

An additional travel charge in the amount of $3.00 shall be added to the above man-hour rate for each 30 miles US (50 Kilometers in Canada) of one way travel, beyond the first 30 miles, (50 Kilometers in Canada) from the servicing RGIS District office.

C. **Minimum Charge:**

US Stores

        Banana Republic/F&T   $ 550.00
        Gap / Kids   $ 425.00
        Old Navy/ON Outlet   $1,150.00
        Gap Outlet/BRFS   $ 850.00

Canadian Stores

        Banana Republic/F&T   $ 570.00
        Gap / Kids   $ 495.00
        Old Navy/ON Outlet   $1,190.00

D. **Volume Incentive**

The following volume discounts shall be provided to Customer in 2008 (February 2008 - January 2009), based upon RGIS achieving the following sales levels with Customer in 2007 (February 2007 through January 2008):

| | |
|---|---|
| $8.0 Million | Base Rates will be reduced by 1.0% |
| $10.0 Million | Base Rates will be reduced by 1.25% |
| $12.0 Million | Base Rates will be reduced by 1.50% |

E. **Store Cancellation Charge:** The minimum charge will be invoiced for any stores that are cancelled by Gap without an acceptable cause (i.e., extreme weather conditions, death, accident, act of war, or other cause beyond Gap's reasonable control) within 48-hours or less of the confirmed scheduled date. Customer will be entitled to an invoice credit, equal to the minimum charge, on any inventory that was cancelled by RGIS without an acceptable cause (i.e., extreme weather conditions, death, accident, act of war, or other cause beyond RGIS' reasonable control, assuming that RGIS has made reasonable efforts to find alternative personnel). All cancellations will be required to be confirmed through e-mail and with the RGIS Business Development coordinator.

5. **Detailed Description of Services:**

   A. **Scheduling:**

   1. All stores are scheduled to begin counting the sales floor one (1) hour after closing. Start times can be negotiated with store manager or designated store representative. The count may begin earlier, provided the store has adequate time to recover from the day's business. All scheduled time changes approved by store manager must be communicated to RGIS Business Development. There shall be no local negotiation of date change except by approval of RGIS Business Development and by Gap Inc.'s Inventory Control. Customer shall provide RGIS with projected inventories levels before each cycle.

   2. RGIS will publish a formal confirmed schedule to Customer which will include the store number, full address, RGIS servicing district, inventory date and start time, mileage from the RGIS servicing district, and rate of charge for each store.

   3. All stores will be scheduled within the scheduling parameters as established by the parties in all inventory cycles.

   B. **Staffing:**

   RGIS will staff each store targeting a sales floor count completion time of six (6) sales floor hours for all Gap, GapKids, Banana Republic, and Forth & Towne stores. Eight (8) hours will be the maximum permissible sales floor time for all Old Navy, Old Navy Outlet, Gap Outlet, and Banana Republic Factory Stores ("BRFS"). RGIS will confirm the staffing with the store manager during the pre-inventory visit. The staffing guideline of one (1) auditor for each 2,500 units will be utilized for all Gap and GapKids. Banana Republic, Forth & Towne, Old Navy, Old Navy Outlet, and BRFS stores will use the guideline of 1 auditor for each 3,000 units. RGIS will use estimates provided by Customer, along with historical productivity, and any anticipated productivity gains for the current cycle when determining the staffing, but shall be fully responsible for ensuring that there is adequate staff to ensure that the maximum sales floor times are not exceeded. Customer has the option to cancel an inventory with no penalty if within one (1) hour of the scheduled sales floor start, RGIS has less than 75% of the planned

staffing present at the store location. In such case, Customer will be entitled to an invoice reduction, equal to the minimum charge.

C. **ID Badges**

All RGIS employees entering any Customer's establishment for the purpose of completing a scheduled inventory are required to present an Inventory Service issued photo ID to the Store Manager conducting the count.

If an Inventory Service issued photo ID is not available, a service employee may present a government issued photo ID. A written agreement between the RGIS Supervisor and the Store Manager will be necessary to allow RGIS employee access to the store to complete the count; RGIS shall nevertheless remain fully responsible and liable for any such employee without and ID who performs services for Customer.

If, due to the lack of verified service employees, staffing no longer permits the count to be completed within the established guidelines, the Store Manager will contact Gap IMS regarding the possible cancellation of the inventory count. However, in such case, Customer will be entitled to an invoice reduction, equal to the minimum charge.

D. **Procedures:**

1. RGIS will maintain a formal set of inventory procedures (Exhibit A-1), reviewed and approved by Customer, to be followed by all RGIS districts servicing Customer. Any future revisions shall be reviewed and approved by Customer prior to release to the field.

2. RGIS procedures will cover the following segments:

   - List of equipment and supplies needed.
   - General information on Customer.
   - List of items to review at the pre-inventory visit.
   - Staffing and count completion timeline.
   - Explanation of specific area number assignment.
   - Test count procedures including detail printout, piece count verifications, variance report.
   - In-Store reporting requirements.
   - Final walkthrough with store management and close-out procedures.
   - Store preparation responsibilities.
   - Store pre-count responsibilities.
   - Store evaluation.
   - Billing information.

3. Final data output for each inventory will be posted to a secure WWW site for Gap, Inc retrieval.

E. **Accuracy – Warranty**

RGIS warrants its work to be accurate within plus or minus (1% + or -) of the actual units on hand at the time of the physical inventory. RGIS will retake any inventories that GAP Inc. questions the results, to prove the results of the first count. Customer. will provide appropriate documentation regarding such first count. Stores must be taken within 10 days of the original inventory.

6/13/06                                   10

RGIS will not bill Customer for the second inventory of the store if the results do not meet the one- percent tolerance. If the second count validates the first count, RGIS will bill for both counts.

### Penalties

RGIS has agreed to complete the inventory counts within eight (8) hours for Old Navy and Outlet. All other Gap brands will be completed within six (6) hours. Should the count times exceed upon the agreed upon limits substantially due to the fault of RGIS, a penalty will be assessed and the entire invoice will be discounted, for the specific store, by Gap, based upon the following schedule:

**Gap / Kids / Banana Republic/ Forth & Towne**

| Count Length | Discount |
|---|---|
| 7.0 – 7.9 Hours | 10% |
| 8.0 – 8.9 Hours | 20% |
| 9.0 – 9.9 Hours | 25% |
| 10.0 – 10.9 Hours | 30% |
| Over 11.0 Hours | 40% |

**Old Navy / Outlet**

| Count Length | Discount |
|---|---|
| 9.0 – 9.9 Hours | 10% |
| 10.0 – 10.9 Hours | 20% |
| 11.0 – 11.9 Hours | 25% |
| 12.0 – 12.9 Hours | 30% |
| Over 13.0 Hours | 40% |

Should the count length be extended due to lack of preparation by Gap that substantially impacts the length of the count, RGIS will revert to the labor hour charge for that particular facility. Specifics will be communicated to Gap on the lack of preparation.

EXHIBIT B

ZERO MEANS ZERO: DISCRIMINATION AND

HARASSMENT POLICY OVERVIEW

Gap Inc. believes in treating people with a consistently high level of respect, courtesy and service, regardless of race, color, age, gender, sexual orientation, religion, marital status, pregnancy, national origin/ancestry, citizenship, physical/mental disability, military status or any other basis prohibited by law. Gap Inc. has zero tolerance for discrimination or harassment, and any employee who violates this policy will be subject to

discipline up to and including termination. For purposes of this policy, harassment includes slurs and any other offensive remarks, jokes and other verbal, graphic, or physical conduct that could create an intimidating, hostile or offensive work environment.

In addition to the above, "sexual harassment" includes unwelcome sexual advances, requests for sexual favors, and other visual, verbal, electronic, or physical conduct of a sexual nature. This definition includes many forms of offensive behavior including the following:

- Unwanted sexual advances or propositions;
- Offering employment benefits in exchange for sexual favors;
- Making or threatening reprisals after a negative response to sexual advances;
- Visual conduct: leering, making sexual gestures, displaying of sexually suggestive objects or pictures, cartoons or posters, electronic display or dissemination of such material;
- Verbal conduct: making or using derogatory comments, epithets, slurs and jokes;
- Verbal abuse of a sexual nature, graphic verbal commentaries about a person's body, sexually degrading words used to describe a person, suggestive or obscene letters, notes or invitations; and
- Physical conduct: touching, assault, impeding or blocking movements.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

## ATTACHMENT A

**Insurance Certificates**

[Attached]